of the United States, to bar a remedy upon a foreign contract made in a foreign country, and by its terms not restricted to be executed within such state, I give no opinion. It is an important question, which will require much examination, as to the lex loci operating on contracts. It will be sufficient to decide the question, when it cannot otherwise be avoided. I shall adjudge the replications good.

Robbins then shortly argued the motion for a new trial, and contended that Dana had no authority to bind the testator upon the true construction of the letter of instructions; that the authority of Dana was confined to purchases to be made with ready money, and not on credit. He was a special and not a general agent.

STORY, Circuit Justice. I retain the opinion, which I expressed at the trial. The interests of commerce require a liberal construction of maritime contracts and authorities. The object of Brown was, in case of the disability of Capt. Smith, to confide to the mate the navigation and command of the ship, and to Mr. Dana the whole authority as to the sale and purchase of the cargoes. The owner looked to the purchase of a cargo partly on credit; he expresses his designs in the most clear and decisive language, and looking to the possible inability of Smith, he directs the purchases and sales to be made by the supercargo. What purchases, may I ask, are here meant? The defendants' counsel say, purchase for ready cash. But could this be the serious intention of the owner? The outward voyage might have been unsuccessful. The funds might have been inadequate to any considerable purchases. The vessel might have arrived at Canton without money sufficient to purchase any considerable cargo; was she then to return in ballast? I think that such a construction can hardly be contended for. The owner has not limited the purchases to be made by the supercargo to be purchases for cash. He uses the words with reference to the preceding statements, and I do not feel at liberty to interpose a limitation in his language, where he has used none. There has not been a shadow of evidence, to show that Mr. Brown was dissatisfied with this conduct, and I cannot believe that there ever could have been. I shall over-rule the motion for a new trial, and give judgment for the plaintiff.

Judgment for the plaintiff.

---

## Case No. 2,694.

### CHOTEAU v. RICE.

[This is a decision by the supreme court of Minnesota on appeal from a territorial court designated as a "district court of the United States," and is reported in 1 Minn. 192 (Gil. 166).]

## Case No. 2,695.

### CHOTEAU v. RICE.

[This is a decision on appeal to the supreme court of Minnesota from a territorial court designated as a "district court of the United States," and is reported in 1 Minn. 106 (Gil. 83).]

---

CHOTEAU (UNITED STATES v.). See Case No. 14,793.

CHOTEAU (AMBLER v.). See Case No. 272.

---

## Case No. 2,696.

### CHOUTEAU v. REDFIELD.

Circuit Court, S. D. New York.    March, 1863.

[Cited in Wetter v. Schell, Case No. 17,470; Ullman v. Murphy, Id. 14,325; Davies v. Miller, 130 U. S. 287, 9 Sup. Ct. 561. Nowhere reported; opinion not now accessible. See Fowler v. Redfield, Case No. 5,003.]

---

## Case No. 2,697.

### CHRIST et al. v. BAKER.

[17 Leg. Int. 332.][1]

Circuit Court, E. D. Pennsylvania.    Oct. 12, 1860.

CUSTOMS DUTIES—"BLANKETS."

[The commercial meaning of "blanket," in the tariff act of 1857, is to be traced only to the time of the passage of that act.]

At law. This was an action brought by Christ, Jay & Hess against Joseph B. Baker, collector of customs, to recover the difference between the duties of fifteen and twenty-four per cent., which latter rate had been exacted by the collector upon certain invoices of blankets imported from England by the plaintiffs, and which they, the plaintiffs, alleged were entitled to be entered at the former rate. The tariff act of 1846 [9 Stat., 42] arranged articles in schedules. In Schedule C, "manufactures of wool not otherwise provided for," were charged with a duty of thirty per cent.; and in Schedule E, "blankets of all kinds" were charged with a duty of twenty per cent. The tariff act of 1857 [11 Stat. 192] referred to and adopted the schedules of the act of 1846, but reduced the rates of duty—Schedule C paying twenty-four per cent. instead of thirty, and Schedule E paying fifteen per cent. instead of twenty. The plaintiffs contended that they were entitled to enter these goods at the rate of fifteen per cent., and submitted that the question to be decided was, whether the articles in question were blankets, as commercially known at the date of the act of 1857. The evidence on the part of the plaintiffs showed that these goods were known in the market as blankets as early as 1850. On the part of the defence it was contended that the goods in court, called by the plaintiffs blank-

---

[1] [Reprinted by permission.]